1  Raymond P. Boucher, State Bar No. 115364
     *boucher@kbla.com*
2  Steven D. Archer, State Bar No. 63834
     *archer@kbla.com*
3  Jeffrey A. Koncius, State Bar No. 189803
     *koncius@kbla.com*
4  KIESEL BOUCHER LARSON LLP
   8648 Wilshire Boulevard
5  Beverly Hills, California 90211-2910
   Tel:   310-854-4444
6  Fax:   310-854-0812

7  Attorneys for Plaintiffs
   [Additional Counsel Listed on Signature
8  Page]

9

10              UNITED STATES DISTRICT COURT

11      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

12

13  LILIAN S. ILETO, an individual and         Case No. CV 01-9762 ABC (RNBx)
    mother to JOSEPH S. ILETO,
14  deceased, and JOSHUA STEPAKOFF,            **SECOND AMENDED COMPLAINT
    a minor, by his parents LOREN LIEB         FOR WRONGFUL DEATH,
15  and ALAN B. STEPAKOFF, and                 SURVIVAL, PUBLIC NUISANCE,
    MINDY GALE FINKELSTEIN, a                  AND NEGLIGENCE**
16  minor, by her parents, DAVID and
    DONNA FINKELSTEIN, and                     Judge:  Audrey B. Collins
17  BENJAMIN KADISH, a minor, by his
    parents, ELEANOR and CHARLES               Trial Date:      December 4, 2012
18  KADISH, and NATHAN LAWRENCE
    POWERS, a minor by his parents,
19  GAIL and JOHN MICHAEL
    POWERS, for himself and on behalf of
20  a class of persons similarly situated,

21              Plaintiffs,

22         v.

23  GLOCK, INC., a Georgia corporation;
    GLOCK GmbH, an Austrian business
24  entity; CHINA NORTH INDUSTRIES
    CORP. a/k/a NORINCO, a Chinese
25  business entity; DAVIS INDUSTRIES,
    a California corporation; REPUBLIC
26  ARMS, INC., a California corporation;
    JIMMY L. DAVIS, an individual;
27  MAADI, an Egyptian business entity;
    BUSHMASTER FIREARMS, a Maine
28  corporation; IMBEL, a Brazilian



business entity; THE LOANER
PAWNSHOP TOO, a Washington
corporation; DAVID McGEE, an
individual; INTRAC ARMS
INTERNATIONAL, INC., a Tennessee
corporation, successor in interest to
INTRAC ARMS INTERNATIONAL,
L.L.C., formerly doing business as
INTRAC CORPORATION; CHINA
NORTH INDUSTRIES GUANGZHOU
CORP.; MIN SHAN MACHINE
BUILDING FACTORY; DOE
IMPORTERS 5-50; DOE
DISTRIBUTORS 50-100; DOE
DEALERS 100-150,

Defendants.

## **SECOND AMENDED COMPLAINT**

Plaintiffs Lilian Santos Ileto, sole surviving parent of deceased, Joseph Santos

Ileto; Joshua Stepakoff, a minor through his parents, Loren Lieb and Alan B. Stepakoff;

Mindy Finkelstein; Benjamin Kadish, a minor through his parents, Eleanor and Charles

Kadish; and Nathan Powers, a minor through his parents, Gail and John Michael

Powers, by their undersigned counsel, allege as follows:

### **Nature of the Action**

1.      Plaintiffs were killed or injured in a shooting spree by Buford O'Neal

Furrow, Jr. ("Furrow"), a man copiously armed with firearms manufactured, marketed,

distributed and sold by defendants. At the time Furrow inflicted these injuries and

death, he was prohibited under federal and state law from possessing or purchasing

firearms; had experienced homicidal and suicidal fantasies and had been hospitalized

because of his mental instability; and was in possession of illegally converted firearms

and firearms considered illegal under applicable state and/or local laws. Defendants, by

knowingly marketing, distributing and selling firearms, including the firearms used in

this case, in ways designed to facilitate and encourage easy access by prohibited

persons, such as Furrow, created an undue risk that Furrow, and other prohibited

persons, would acquire and possess their firearms to do injury to others, including these

SECOND AMENDED COMPLAINT

1   plaintiffs. This knowing conduct by defendants has created or contributed to a public
2   nuisance, which under California law is an unreasonable and substantial interference
3   with rights common to the public. Plaintiffs are entitled to relief from defendants
4   because the public nuisance created by defendants has inflicted on plaintiffs harm and
5   injury different in kind from that suffered by the general public. Plaintiffs are also
6   entitled to relief from defendants because this knowing conduct by defendants created a
7   foreseeable risk that a person with injurious intent, such as Furrow would obtain and
8   unlawfully possess defendants' firearms, and thus be enabled to act on that injurious
9   intent.

10                                      **Parties**

11          Plaintiffs

12          2.      Plaintiff Lilian Ileto is the mother, former dependent, and only surviving
13   parent of decedent Joseph Ileto, who was shot and killed on or about August 10, 1999.
14   She currently resides in Los Angeles County, California. Because Joseph Ileto died
15   without a wife or children, she brings these claims as the sole heir entitled to recover by
16   intestate succession for the death of her adult son. Plaintiff Lilian Ileto sues to recover
17   for her and her son's losses as a result of his injury and death. She has executed and
18   filed with the initial complaint the declaration under penalty of perjury required by
19   California Code of Civil Procedure § 377.32 and a certified copy of Joseph Ileto's death
20   certificate, true and correct copies of which are attached hereto and incorporated here
21   by this reference.

22          3.      Plaintiff Joshua Stepakoff is the seven-year-old minor son of Plaintiffs
23   Loren Lieb and Alan Stepakoff, who currently reside in Los Angeles County,
24   California. They sue on behalf of their minor son to recover for the specific and direct
25   personal injuries and residual harm suffered by their son as a result of gun shot wounds
26   to his left leg and hip.

27          4.      At the time of filing of the original complaint, plaintiff Mindy Gail
28   Finkelstein was a seventeen year old minor who resides in Los Angeles County,

SECOND AMENDED COMPLAINT

California. David and Donna Finkelstein sued on her behalf to recover for the specific and direct personal injuries and residual harm suffered from gun shot wounds to her right leg.

5.    Plaintiff Benjamin Kadish is the six-year-old-minor son of Plaintiffs Eleanor and Charles Kadish, who currently reside in Los Angeles County, California. They sue on behalf of their minor son to recover for the specific and direct personal injuries and permanent residual harm suffered by their son as a result of gun shot wounds to his lower body and left leg.

6.    Plaintiff Nathan Lawrence Powers is the five-year-old-minor son of Plaintiffs Gail and John Michael Powers, who currently reside in Los Angeles County, California. They sue on behalf of their minor son to recover for the specific and direct physical and emotional injuries suffered by a shock to his nervous system upon experiencing and witnessing the events described herein.

<u>Defendants</u>

7.    Defendants are the manufacturers, importers, marketers, distributors, and dealers of firearms found illegally and used in the commission of crimes on a continuing and ongoing basis in the United States, California and Los Angeles County. Defendants are sued individually, jointly and severally.

8.    Upon information and belief, Defendant Glock, Inc. is a Georgia corporation with its principal of business at 6000 Highlands Parkway, Smyrna, Georgia 30082, and Defendant Glock, GmbH, is an Austrian Company with its principal place of business at Hausfeldstrasse 17, Deutch Wagram, A-2232, Ausria. Glock, Inc., and Glock GmbH are referred to collectively herein as "Glock."

9.    Upon information and belief, Defendant China North Industries Corp., a/k/a Norinco ("Norinco"), is a corporation approved by the People's Republic of China with its principal place of business at 7A Yue Tan Nan Jie, Beijing, China.

10.    Upon information and belief, Defendant Davis Industries ("Davis Industries") is a California corporation with its principal place of business at 15150

SECOND AMENDED COMPLAINT

1  Sierra Bonita Lane, Chino, California 91710.

2      11.    Upon information and belief, Defendant Republic Arms, Inc. ("Republic")
3  is a California Corporation with its principal place of business at 15167 Sierra Bonita
4  Lane, Chino, California 91710. Republic Arms, Inc. was organized under the laws of
5  the State of California in 1995, as the alter ego of Defendant Davis Industries, for the
6  purpose of operating as one enterprise using the same employees, equipment and
7  management of Davis Industries, in an attempt to shield itself from liability. As the
8  alter ego of Republic, Davis Industries is and has been managing, controlling, and
9  conducting the affairs of Republic since its inception, as though it was the same
10 business entity for the purpose of defrauding plaintiffs and others similarly situated.

11     12.    Upon information and belief, Defendant Jimmy L. Davis is a citizen of the
12 State of California, and is the owner of Defendants Davis Industries and Republic.
13 Defendant Jimmy L. Davis organized or caused to be organized Republic under the
14 laws of the State of California for the purpose of operating a firearm manufacturing,
15 assembly and distribution company and, upon information and belief, Defendant Jimmy
16 L. Davis has held the office of Chief Executive Officer from the dates of incorporation
17 to the present time. Defendant Jimmy L. Davis, as the alter ego of Defendants Davis
18 Industries and Republic, is and has been managing, controlling, and conducting the
19 affairs of the corporations since their inception, as though they were Defendant Jimmy
20 L. Davis's own businesses, and has used defendant corporations for the purpose of
21 defrauding plaintiffs and others similarly situated. There exists, and at all times herein
22 mentioned has existed, a unity of interest and ownership between Republic, Davis
23 Industries and Jimmy L. Davis such that any individuality or separateness has ceased
24 and Defendant Jimmy L. Davis is the alter ego of Davis Industries and Republic.

25     13.    Upon information and belief, Defendant Bushmaster Firearms
26 ("Bushmaster") is a Maine Corporation with its principal place of business at 120
27 Mountain View Avenue, Bangor, Maine.

28     14.    Upon information and belief, Defendant Imbel is a Brazilian corporation

SECOND AMENDED COMPLAINT

1   with its principal place of business at Industria de Material Belico do Brasil-IMBEL,
2   Av 15 de Marco-Casa 1, Vila Estreia, CEP 126200-000, Piquette-SP, Brazil.

3        15.     Upon information and belief, Defendant Maadi is an Egyptian corporation
4   with its principal place of business at Helwan, Maadi, Hakim, A642 Ordnance Factory
5   in Cairo, Egypt.

6        16.     Plaintiffs having been ignorant of the true name of the defendant and
7   having designated the defendant in the initial complaint by the fictitious name Doe 1
8   and having discovered the true name of the defendant to be RSR Management
9   Corporation ["RSR"] now substitutes the true name for the fictitious name and alleges
10   on information and belief that RSR is a corporation which plaintiffs are informed and
11   believe is incorporated under the laws of the State of Florida, with its principal place of
12   business as 4405 Metric Drive, Winter Park, Florida 32792. Based on information and
13   belief, RSR Management Corporation distributes firearms in California, including guns
14   manufactured by the defendants.

15        17.     Plaintiffs having been ignorant of the true name of the defendant and
16   having designated the defendant in the initial complaint by the fictitious name Doe 2
17   and having discovered the true name of the defendant to be RSR Wholesale Guns
18   Seattle, Inc., ["RSR Seattle"], now alleges on information and believe that RSR Seattle
19   is a Washington corporation with its principal place of business at 3848 148th Avenue,
20   NE, Redmond, Washington, 98052. Based on information and belief, RSR Seattle
21   distributes firearms in California, including guns manufactured by the defendants.

22        18.     Plaintiffs having been ignorant of the true name of the defendant and
23   having designated the defendant in the initial complaint by the fictitious name Doe 3
24   and having discovered the true name of the defendant to be China North Industries
25   Guangzhou Corp., now alleges on information and belief that it is a corporation
26   approved by the People's Republic of China with its principal place of business at
27   Norinco Bldg., 376 Huanshi Dong Road, Guangzhou, China.

28        19.     Plaintiffs having been ignorant of the true name of the defendant and

having designated the defendant in the initial complaint by the fictitious name Doe 4 and having discovered the true name of the defendant to be Min Shan Machine Building Factory, now alleges on information and belief that it is a corporation or other business entity approved by the People's Republic of China with its principal place of business in China.

20.     At all times relevant thereto, DOES 5 through 50 were business entities, importers, or individuals, whose identities are currently unknown, who manufactured, imported, marketed, and distributed firearms causing injury to the plaintiffs.

21.     At all times relevant hereto, DOES 51 through 100 were business entities, distributors, or individuals, whose identities are currently unknown, who marketed, distributed, supplied, and sold firearms causing injury to the plaintiffs.

22.     At all times relevant hereto, DOES 101 through 150 were business entities, dealers, or individuals, whose identities are currently unknown, who marketed, distributed, supplied, and sold firearms causing injury to the plaintiffs.

23.     The true names and capacities, whether individual, corporate, associate or otherwise, of those defendants named herein as DOES 5 through 150, inclusive, are presently unknown to plaintiffs, who therefore sues said defendants by such fictitious names. Plaintiffs are informed and believe and on that basis allege that each such defendant participated in the acts complained of herein or otherwise is liable therefore, and the plaintiffs' damages as alleged herein were directly and proximately caused by the acts of each such defendant. When the true names and capacities of said defendants are ascertained, plaintiffs will seek leave of Court to amend this Complaint accordingly.

24.     Plaintiffs are informed and believe and on that basis allege that at all times mentioned herein, each defendant was the agent, servant, employee and/or associate of each of the other defendants, and was at all times acting within the course and scope of such relationship in committing the acts alleged in this Complaint.

25.     Whenever appearing in this Complaint, each and every reference to "defendants" is intended to be, and shall be deemed, a reference to all defendants in this

SECOND AMENDED COMPLAINT

1   action, and each of them, named and unnamed, including all fictitiously named

2   defendants.

3                        General Factual Allegations

4          26.    On or about August 10, 1999, Furrow, carrying firearms manufactured,

5   marketed, imported, distributed or sold by defendants, approached the North Valley

6   Jewish Community Center (hereinafter "JCC") located at 16601 Rinaldi Street,

7   Granada Hills, California 91344. Furrow had the following firearms in his possession:

8   Defendant Glock's model 26, a 9 mm handgun; Defendant Norinco's model 320, a 9

9   mm rifle which had been illegally converted by shortening the barrel; Defendant

10  Maadi's model RML, a 7.62 caliber automatic rifle; Defendant Bushmaster's model

11  XM15-E25, a .223 caliber rifle; two of Defendant Imbel's model L1A1, a .308 caliber

12  rifle; and Defendant Davis Industries' model D-22, a .22 caliber handgun.

13         27.    Furrow entered the JCC and shot and injured three children, one teenager,

14  and one adult. Two of the children were Plaintiffs Joshua Stepakoff and Benjamin

15  Kadish, who were campers at the JCC. Joshua, six years old at the time of the shooting,

16  was shot twice in the left lower leg and left hip, fracturing or breaking a bone.

17  Benjamin, five years old at the time, was shot twice in the buttocks and left leg,

18  fracturing his left femur, severing an artery, and causing major internal injuries.

19  Plaintiff Mindy Finkelstein, who was a sixteen-year-old camp counselor at the time of

20  the shooting, was shot twice in her right leg. Plaintiffs Stepakoff, Kadish and

21  Finkelstein suffered severe, life-threatening bodily injuries, emotional distress, and

22  permanent residual harm.

23         28.    Plaintiff Nathan Powers, a four-year-old camper at the time, witnessed and

24  experienced the events at the JCC on August 10, 1999 as they unfolded in his presence.

25  The shooting terrified and shocked him so severely that it caused him to suffer great

26  mental suffering, anguish, and anxiety and severe shock to his nervous system. As a

27  result, he has suffered and and will continue to suffer severe emotional distress.

28         29.    Furrow fled the JCC with the same firearms still in his possession. Later

SECOND AMENDED COMPLAINT

1  the same day, Furrow saw Joseph Ileto, an employee of the U.S. Postal Service
2  delivering a mail route in Chatsworth, California. Furrow shot and killed Joseph Ileto.

3        30.    Among the evidence recovered at both crime scenes were 9mm casings. Of
4  the firearms in Furrow's possession, the following are chambered for 9mm
5  ammunition: the Norinco and the Glock.

6        31.    At the time of these events and beginning in October of 1998, Furrow was
7  prohibited under federal law from possessing, purchasing or using any firearm, having
8  been committed to a psychiatric hospital in 1998, placed under felony indictment in
9  1998, and convicted of assault in the second degree on or about May 21, 1999 in the
10  State of Washington. At the time of his hospitalization, Furrow was determined to be a
11  danger to himself and others, having suicidal and homicidal thoughts. Specifically, he
12  expressed a desire to commit mass murder. Plaintiffs are informed and believe that
13  under applicable law, as a result of his psychiatric commitment and felony indictment,
14  Furrow was also a prohibited firearms purchaser prior to purchasing certain of
15  defendants' firearms and/or the ammunition used to injure and kill plaintiffs.

16        32.    Defendants are legally responsible for some or all of the harm associated
17  with the purchase, possession and use by Furrow of their firearms because their conduct
18  facilitates access to their firearms by prohibited persons and in so doing, they
19  knowingly facilitate and contribute to, participate to a substantial extent in, and create a
20  public nuisance. Defendants' distributional conduct poses a danger to the public and
21  caused the particular injuries and death to plaintiffs.

22        33.    Defendants are legally responsible for the injuries and death to plaintiffs
23  because their deliberate and reckless marketing strategies created an undue risk that
24  their firearms would be distributed to and obtained persons with injurious intent, such
25  as Furrow, who, when in possession of such firearms, would foreseeably inflict injury
26  or death to others, including plaintiffs.

27        34.    As is more specifically alleged hereinafter:

28        35.    Defendants produce, market, distribute and sell substantially more firearms

than they reasonably expect to be bought by law-abiding purchasers, and they knowingly participate in and facilitate the secondary market where persons who are illegal purchasers and have injurious intent obtain their firearms. Between 1994 and the end of 1997, despite a decline in the number of households owning firearms, and despite the approximately 65,000,000 handguns already in circulation, this country's domestic gun manufacturers produced a total of approximately 7,196,000 additional handguns. Moreover, since the early 1990's, manufacturers have increasingly produced more rapid firing, higher caliber firearms, such as 9mm semiautomatic pistols. In the intervening years, the semiautomatic pistol production rate and the homicide rate have mirrored each other.

36.     Defendant manufacturers and distributors select and develop distribution channels that they know regularly provide guns to criminals and underage end users. Defendant manufacturers and distributors have been specifically so informed in connection with crime-gun trace efforts by the U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms ("ATF"). For the past three years, ATF's National Tracing Center has published Crime Gun Trace Reports. The reports analyze a large number of individual traces from many similar jurisdictions to help identify consistent crime gun patterns and to prevent gun violence. The Crime Gun Trace Reports have several audiences including federally licensed firearms businesses. One of the stated goals of the report is to inform firearms businesses about crime gun patterns and to promote sounder and safer business practices. Despite the knowledge obtained from this data, such as the short time to crime of their firearms, defendants knowingly supply a range of disreputable distributors, dealers, gun shops, pawnshops, gun shows, and telemarketers in the State of California and throughout the United States.

37.     Despite the documentation in the ATF reports regarding how firearms move into the illegal market, defendant manufacturers and distributors fail to exercise reasonable care to protect the public from the risks associated with their current marketing and distribution practices, and fail to utilize techniques regarding distribution

SECOND AMENDED COMPLAINT

1  of their products that are commonly employed by responsible businesses in this
2  country.

3       38.    Defendant manufacturers' contracts with their distributors and dealers, and
4  defendant distributors' contracts with their dealers, do not include provisions designed
5  to address the risks associated with acquisition of their firearms by persons prohibited
6  to purchase or possess firearms under state, local, or federal law. Incentive provisions
7  are common in these contracts, demonstrating that defendants know such provisions
8  can influence the practices of the licensed sellers. For example, some of Defendant
9  Glock's distributor agreements prohibit distributors from publishing or advertising
10 Glock wholesale prices and make this condition "the essence of the contract," a second
11 violation of which results in the termination of the distributor agreement. Glock can
12 also terminate a distributor agreement for non-activity after a period of ninety days or
13 for the failure of a distributor to use its best efforts to market Glock products. However,
14 these contracts contain no incentives (or sanctions) that would discourage the sales
15 practices identified in the ATF studies as associated with unreasonably high risk of
16 dispersal of firearms to prohibited persons, such as multiple sales, sales to nonstocking
17 dealers, sales to straw purchasers, sales at gun shows, and other such practices.

18      39.    Defendant manufacturers also design, produce and advertise their products
19 with the illicit market as their target, including by ads for features and practices relevant
20 to this case. For example, Defendant Glock advertises the model 26, used by Furrow in
21 this case, as the "pocket rocket," with the enhanced firepower of a 9 mm or .40 caliber
22 packed into a handgun only four inches high. A capacity of nine or ten rounds makes
23 the "pocket rocket," as described in a major gun magazine, the "Ultimate Conceal
24 Package."

25      40.    Defendants derive significant revenues, amounting to a substantial portion
26 of their total firearm revenues, from the crime market. This crime-market segment of
27 their sales also affects overall sales. Defendants utilize the fear generated by criminal
28 uses of their products to promote more sales to law-abiding citizens for self protection,

11

SECOND AMENDED COMPLAINT

1  without warning about the dangers of possession of a firearm in the home now
2  generally recognized in the field of public health. Defendants fail to adopt even
3  minimal policies and practices completely within their control that would eliminate or
4  ameliorate the crime market.

5      41.    The easy availability of firearms is a matter of general knowledge and
6  experience, commonly known to criminals, young people, and others who may be
7  legally prohibited from purchasing, carrying or possessing them under California or
8  federal law, including California Penal Code § 12028(a).

9      42.    Defendants maintain unusual secrecy about their marketing policies and
10 practices. However, recent investigations, studies and expert analyses have revealed
11 considerable detail about the workings of the criminal firearm market, about these
12 particular defendants' roles in it, and about the marketing and distribution practices that
13 led to Furrow's possession of defendant manufacturers' firearms on August 10, 1999.

14     43.    Defendants market their guns to get into the secondary market.

15     44.    The secondary market results in a high percentage of crime guns. As much
16 as forty percent of all gun sales occur in the secondary market by an unlicensed gun
17 seller. Secondary sales are much more likely to be traced to crime. A 1999 ATF report
18 of ATF's trace analysis in thirty-two cities, found that in eighty-nine percent of trace
19 requests where the gun possessor and the purchaser are known, they are not the same
20 individual. The evidence that Defendants market their guns to get into the secondary
21 market includes but is not limited to the following:

22     45.    Defendants use a two-tier distribution system. They sell their firearms to
23 distributors, who distribute them through dealers.

24     46.    Defendant manufacturers' dealings and relationships with distributors and
25 dealers are discretionary and voluntarily contractual. Defendant manufacturers establish
26 and maintain these distribution relationships and the distribution system described
27 herein, and they are able to set the terms and conditions, including distribution policies
28 and practices, and to discipline or terminate relations with distributors or dealers who

SECOND AMENDED COMPLAINT

1  will not accept their terms or fail to comply. It is within the power, discretion and

2  control of defendant manufacturers to modify the policies and practices of their

3  distributors and dealers, to seek alternative distribution channels, or to establish their

4  own. Defendant distributors, acting as agents of manufacturers, have the same control

5  over their relationship with dealers.

6      47.    The existing firearm distribution system and structure was established by

7  the firearms industry and is maintained and used by all of the defendants.

8      48.    Although a number of jurisdictions including the City of Los Angeles at

9  the time of the shootings described here prohibit multiple sales of handguns, a

10  substantial portion of the lawful, primary firearms market is "multiple sales" -- one

11  person buying two or more firearms at the same time or over a particular time period,

12  frequently of the type that are easily concealed and therefore particularly useful for

13  criminal purposes. A study in one city found that about half of the handguns purchased

14  in a 15-month period were sold to someone who bought at least two, 30% were sold to

15  someone who bought three or more, and 17% were sold to the industry's and

16  defendants' best customers, who bought 5 or more. A report published by the ATF

17  states that ATF's trace analysis in thirty-two cities, suggests that multiple sales

18  accounted for nearly a quarter of firearms (22%) first sold at retail in 1999, and traced

19  to crime in 1999. None of the defendants engage in business practices designed to

20  discourage multiple sales. Instead, their practices facilitate such sales.

21      49.    A very small number of distributors and a very small number of dealers

22  yield an extraordinarily large proportion of the firearms used in crime.

23      50.    A very large proportion of guns used in crimes were multiple or single

24  "straw" purchases, in which someone purchases a firearm for someone else who may be

25  prohibited from purchasing by state or federal law. Such sales are illegal under federal

26  law. However, according to a recent national study, more than half of the firearms

27  subject to firearm trafficking investigations were initially acquired as part of a straw

28  purchase. At least one major firearms manufacturer provides educational training to

SECOND AMENDED COMPLAINT

1  licensed dealers of its products, to sensitize them on how to identify straw purchases.
2  None of the defendants do so.

3       51.    It is well documented that individuals claiming to be "collectors" obtain
4  and supply multiple firearms to criminals, particularly at gun shows, to circumvent any
5  record keeping or reporting requirements.

6       52.    A large proportion of the firearms used in crime were sold recently, within
7  three years of the crime, and only a small proportion were stolen. This is true nationally
8  and in the City and County of Los Angeles. A report published by the ATF states that
9  ATF's trace analysis in thirty-two cities, including Los Angeles, suggests that nearly
10  1/3 of recovered crime guns are new guns sold in less than three years of the crime. In a
11  1994 ATF trace study, at least twenty-five percent of recovered firearms were seized
12  within three years of their initial sale. Also in the same study, of the 5,002 guns in the
13  sample recovered by law enforcement in Los Angeles, only six percent were reportedly
14  stolen.

15       53.    The ATF traces recovered guns used in state, local and federal crimes, in
16  recent years tracing approximately 200,000 crime guns nationally per year. ATF
17  reported in February 2000 that a relatively small number of dealers -- about 1% --
18  account for over half of the successfully traced guns used in crime.

19       54.    A congressional study of ATF data released in December, 1999 found that
20  an extraordinary proportion of crime guns bought from "high crime" gun stores were
21  probably straw purchased: of 35,000 crime guns traced to 140 "high crime" gun stores,
22  87% were possessed by someone other than the buyer (e.g., they have entered the
23  secondary market). The study also found that one-third of these crime guns were
24  recovered in connection with a crime within just one year of purchase, and half were
25  traced to crimes within two years of purchase.

26       55.    New, but limited, ATF data just made available identify specific
27  distributors and dealers and confirm these conclusions.

28       56.    Firearms used in crime constitute a very substantial proportion of

       SECOND AMENDED COMPLAINT

defendants' firearms sales. The 1999 ATF report demonstrates that Glock 9mm semiautomatic pistols were among the most frequent crime guns (traced to crime) used by juveniles and adults in Los Angeles, ranking 8 out of 10 must frequently crime guns overall for all age groups. Defendant Norinco's 7.62mm rifle constituted 6% of all long gun trace reports nationwide in 1999, constituting the third most frequently traced long gun for all age groups. Both the Norinco 7.62 and Glock 9mm pistols were among the more frequently recovered crime guns nationwide in the 1999 ATF study of 32 major cities. The same study reports that nearly a third of recovered crime guns for which time to crime would be computed were "new guns," that is, the had been purchased within three years of their use in crime.

57.     ATF has concluded that "kitchen table" dealers, who may be licensed but have no store, and pawn shop dealers play a significant role in gun trafficking. Of the investigations conducted for the study, "kitchen table" dealers were a source of 23% of the trafficked firearms, and 38% of the trafficked guns came from pawn shops. A 1994 ATF study conducted in Los Angeles revealed that ten of the fifteen retailers accused of illegal gun trafficking were "kitchen table" dealers.

58.     The same ATF study also concludes that licensed dealers ("FFL," described in more detail, infra) are a significant source of crime guns. In the study, although FFLs were involved in a small proportion of ATF trafficking investigations, FFL traffickers were associated with by far the highest mean number of illegally diverted firearms per investigation -- nearly half of the total number of trafficked firearms documented during the two-year study. The study also shows that half of the licensed dealers who maintain a gun store business premises also sell firearms at gun shows, which were a significant source of crime guns, particularly in the southwestern and western regions. Felons were associated with selling and purchasing firearms in 46% of the gun show investigations.

59.     The ATF reports, as well as other reports, also identify sales at gun shows as a substantial source of crime guns throughout the country. These events also generate

SECOND AMENDED COMPLAINT

considerable revenue for defendants. It has been estimated that there are as many as 5,000 gun shows per year with more than five million attendees generating billions of dollars in sales. Gun shows provide a natural recruiting environment. Many more are being held now than ever before, and many more people are attending them.

60.   The National Shooting Sports Foundation, a trade association to which Glock is a member, actively promotes gun shows and has requested that its members promote them as a viable distribution channel.

61.   Larry Ford, group supervisor of the ATF Detroit Firearms Trafficking Group, advises that "personal collections" often sold at gun shows contribute to illegal gun trafficking: The problem would be the regular citizen's being able to go and put their own firearms on display without a license or any paperwork being done. Based on the type of cases that we put together in our group, some [criminals] indicate that they bought their firearms at local gun shows and flea markets.

62.   Although defendants publicly claim that they market and sell to purchasers who want a firearm for self-protection and to "collectors" and that firearms used in crime are usually stolen, the easy availability of firearms for criminal purposes is a direct, known result of defendants' marketing and distribution policies and practices. Defendants also fail to take reasonable steps within their power and discretion that would eliminate or minimize the easy availability of firearms to the secondary market and hence for criminal purposes.

63.   According to the former Senior Vice President for Marketing and Sales of Smith & Wesson, the largest manufacturer of handguns, the "industry as a whole," including these defendants, is fully aware of the extent of the criminal misuse of firearms. The industry is also aware that the illicit market in firearms is not simply the result of stolen guns but is due to the seepage of guns into the illicit market from multiple thousands of unsupervised federal firearms licensees. In spite of their knowledge, however, the industry's position has consistently been to take no independent action to insure responsible distribution practices . . . . I am familiar with

SECOND AMENDED COMPLAINT

the distribution and marketing practices of all of the principal U.S. firearms manufacturers and wholesale distributors and none of them, to my knowledge,... investigate, screen or supervise the wholesale distributors and retail outlets that sell their products to insure that their products are distributed responsibly. Affidavit of Robert I. Hass, February 20, 1996, on file in Hamilton v. Accu-Tek, U.S. District Court, E.D.N.Y., 95 CV 0049 (JBW).

64.    Glock provides its dealers with optional "Customer Safety Awareness Forms" to be filled out at the time of sale by a dealer to a Glock purchaser. The form, to be initialed by the buyer and mailed back to Glock, aims to instruct a purchaser about such things as the loading, unloading, and the basic functioning of a Glock pistol. In conjunction with this practice, Glock has a drawing once a month from the group of returned cards, and it gives a free gun to the local gun dealer whose name appears on the card. No similar incentives, instructions or warnings are made with respect to the danger of secondary sales such as sales at gun show.

65.    Defendant manufacturers repeatedly and continually use marketing strategies and distribute their firearms through distribution channels, including specific distributors and dealers, gun shows, telemarketers, and "kitchen table" and "car trunk" dealers, that they know or should know regularly yield inordinate numbers and proportions of criminal end users.

66.    Defendant manufacturers have actual knowledge and are specifically placed on notice of such crime-prone distribution channels by the ATF, and such notice includes sufficient numbers of their products used in crime to alert any reasonable person. For example, based on publicly available data for the three-year period from 1995 to 1998 (which is not as complete as the actual data received by defendants), not less than 10,000 of Defendant Glock's firearms were traced to crimes, and at least 15,000 each of Defendants Norinco and Davis Industries were traced to crimes.

67.    Each ATF crime-gun trace referred to above starts with a direct communication to the manufacturer, who is thereby informed that a particular gun it

SECOND AMENDED COMPLAINT

1    produced, identified by model and serial number, was used in a crime. ATF asks the
2    manufacturer for the identity of the distributor to whom the manufacturer first sold the
3    weapon. ATF inquiries to this distributor in turn yield the identity of any successor
4    distributors and dealers to whom the weapon was sold, together with the identity of a
5    retail purchaser. ATF uses this process to establish the entire distribution chain.

6        68.    Each of these trace requests to a manufacturer therefore effectively inform
7    the manufacturer that one of its weapons had been involved in criminal activity, since
8    such activity constitutes the reason for the initiation of an ATF trace. Defendant
9    manufacturers know – from their own records -- the particular distributor through
10   whom each gun was first distributed. (They also have or can obtain the identities of the
11   particular distributors and dealers subsequently involved in the sales chain for each
12   ATF-identified crime gun.)

13       69.    Thus, the ATF crime trace requests, together with other data in the
14   possession of defendant manufacturers, provide a clear picture for each defendant
15   manufacturer of the crime-producing tendencies of its various initial distribution
16   channels. They also possess, have access to or can obtain the identities of other
17   distributors and dealers that may be in the sales chain for each traced crime gun.

18       70.    Defendant manufacturers choose not to use the data literally placed in their
19   hands on a daily basis by the ATF to change their marketing and distribution practices
20   to reduce the foreseeable risk that their firearms will become possessed by prohibited
21   persons, including those such as Furrow who obtain them to inflict injury and death.
22   Nor do defendant manufacturers take reasonable preventative measures in response to
23   ATF compilations of the data or other available data, including the number of prior
24   crime-gun traces for each distributor and dealer identified in a trace, which often
25   appears on routine trace reports. Because the existing marketing and distribution
26   practices of defendants bear no relation to market demand of the legal market, their
27   conduct has little or no social utility. Accordingly, they have a duty to exercise
28   reasonable care not to increase or encourage the risk of foreseeable injuries by third

1    parties who gain ready access to firearms because of defendants' practices and who by
2    law are prohibited possessors because they have been determined to be incompetent to
3    handle the responsibility associated with gun possession.

4        71.    Similarly, defendant distributors receive actual notice regarding their
5    distribution channels and, nevertheless, take no restrictive or protective actions that
6    could limit criminal and prohibited access.

7        72.    The ATF data referred to above have been available to the public in
8    summary form for some time, but until very recently ATF routinely redacted the names
9    of particular distributors and dealers from data it released to the public, public officials
10   and researchers in the field. (Sometimes such data were included in response to a
11   specific trace request by law enforcement regarding a particular crime, and it has been
12   regularly available to defendants, as set out above.) However, some of the previously
13   redacted data are now available, and they show not only that there are quite significant
14   differences in the crime-trace records of the various distribution channels, but which
15   particular distributors and dealers yield inordinate numbers or proportions of crime
16   guns.

17       73.    All of defendant manufacturers' firearms, including their firearms
18   involved in these incidents, are marketed and sold through the distribution system
19   described herein.

20       74.    Therefore, all of the allegations, studies and data and defendants'
21   knowledge thereof-- pertaining to the marketing and distribution policies and practices
22   set out herein, specifically apply to defendants and to the resulting harm to the public
23   and the special and particularized injuries to plaintiffs.

24       75.    Defendant manufacturers do not monitor or supervise their distributors or
25   dealers, except in ways that are aimed at maximizing profits.

26       76.    Some defendant manufacturers have written distribution agreements that
27   provide for the right of termination, and occasionally they have terminated or warned
28   distributors or dealers. However, a dangerous sales practice such as one that would

make guns easily available for potential criminal use has not been the basis for termination and is not included in the terms of the agreements. The reasons identified for termination are: not maintaining minimum prices, advertising the price that the distributor pays to the manufacturer, or selling into the wrong market (e.g., some distributors are forbidden to sell to law enforcement, or to make foreign sales). There is no mention of termination for selling to or facilitating the crime market.

77.    Defendant manufacturers purposely avoid any connection to or "vertical integration" with the distributors and dealers that sell their products. They offer high volume monetary incentives and generally refuse to accept returns, and they contractually attempt to shift all liability and responsibility for the harm done by their products.

78.    Defendant firearm manufacturers do not use available computerized inventory and sales tracking systems that are commonly and inexpensively used throughout American industry to limit and screen customers, particularly in industries that produce dangerous or harmful products.

79.    Other manufacturers of dangerous or harmful products, including manufacturers of chemicals and paints, place restrictions and limits on the distribution, distributors, and dealers of their products to avoid known detrimental consequences. In sharp contrast, defendant manufacturers have completely failed and refused to adopt any such limits or to engage in even minimal monitoring or supervision of their distributors and dealers.

80.    Some of these practices and policies are not exclusive to this industry. However, high volume sales of this product designed to be instantaneously lethal -- without monitoring, supervision or regard for who is purchasing, the purposes of the purchasers, or the quantities purchased -- recklessly creates a serious, known risk and has directly harmed the public and these particular plaintiffs.

81.    Defendant manufacturers do not require that their dealers and retailers be trained or instructed: (a) to detect inappropriate purchasers; (b) to educate purchasers

1  about the safe and proper use and storage of firearms, or to require any training or
2  instruction; (c) to inquire or investigate purchasers' level of knowledge or skill or
3  purposes for buying firearms; or (d) to train purchasers who intend to carry a concealed
4  firearm about the appropriate circumstances in which to pull it out and fire it.

5      82.   Defendant manufacturers do not provide their distributors and dealers with
6  any assessment, require them to report, or train them regarding the dangers and
7  practices alleged herein.

8      83.   Similarly, defendant distributors have not limited, monitored or supervised
9  their dealers, and defendant dealers have not limited or monitored their purchasers, or
10  kept track of or used ATF-trace and other information in their possession or available to
11  them that could be used to limit or monitor purchasers.

12      84.   Defendant manufacturers' marketing practices have knowingly appealed to
13  and facilitated the criminal firearm market.

14      85.   Defendant manufacturers have increased the production of particular
15  firearms that are popular for use by criminals. For example, over the past decade,
16  during which the handgun market has been stagnant (until the Y2K and millennium
17  scares), firearm manufacturers, including defendants or some of them, increased their
18  production of 9 millimeter handguns although their own market research showed that
19  the market for 9 millimeters among law-abiding purchasers was already saturated. Nine
20  millimeter handguns are popular in the illicit drug trade and, according to most national
21  studies, are the most frequently used in crime. A recent study in one state concluded
22  that they are the firearm of choice for criminals, accounting for almost a third of the
23  homicides. In particular, a report published by the ATF states that ATF's trace analysis
24  in thirty-two cities, showed that among youth, 9 mm handguns had a shorter time to
25  crime than any other model gun and that time to crime amounted to less than two years.
26  In the same report, Glock's nine-millimeter semiautomatic accounted for fifty percent
27  of all crime guns traced in ten of the cities studied and was in the top ten most
28  frequently traced crime guns by manufacturer and caliber in Los Angeles. Also in the

1  top ten most frequently traced crime guns in Los Angeles was Norinco.

2      86.   Defendant manufacturers have sometimes designed and advertised

3  particular features of their products that appeal to purchasers with criminal intent.

4      87.   Defendant manufacturers design their firearms with features that are

5  unnecessary or detrimental for use by a law-abiding person seeking self-protection in

6  his or her home but are attractive, useful, and not detrimental for criminal use in a

7  burglary, robbery, street murder, or drive-by shooting.

8      88.   In 1995, defendants or some of them, including Defendants Glock and

9  Republic Arms, began to introduce firearms nicknamed by the industry as "pocket

10  rockets," concealable and powerful handguns, all features that are attractive to those

11  with criminal intent, such as Furrow. The pocket rocket is the weapon of choice for the

12  day-to-day operations of gang members because of their caliber, their capacity, and

13  their concealability. Between the years 1995-1997, the ATF has traced at least 13,000

14  of these "pocket rockets" to crime scenes nationally.

15      89.   One of the first to introduce these new firearms, Defendant Glock released

16  the Glock models 26 and 27, both having a height of only 4 inches but firepower in the

17  9mm and .40 caliber range. Defendant Glock nicknamed the new gun the "pocket

18  rocket."

19      90.   Defendant Glock marketed the "pocket rocket" to police as a back-up

20  lightweight side-arm with the intention of profiting both from the first-time purchase to

21  police and the after-sales on the civilian or secondary market, which were traded-in to

22  either the manufacturer or gun stores and resold after initial use by police. It is a long-

23  established fact that Glock targets the police market first as a tactic to entice the civilian

24  market, where firearms associated with use by law enforcement are in great demand

25  and disproportionately traced to crime. In 1995, founder and president, Gaston Glock,

26  explained it as such: It was a conscious decision to go after the law enforcement market

27  first. In marketing terms, we assumed that, by pursuing the law enforcement market, we

28  would receive the benefit of 'after sales' in the commercial market. Ad Age's

22                    SECOND AMENDED COMPLAINT

1 Marketing 100 (1995).

2     91.    Defendant Glock marketed the "pocket rocket" as a favorite of
3 "professionals" or the gun of "professionals" even though it knew some police
4 departments found the gun unsatisfactory and the gun should not be used by anyone
5 other than the skilled or trained user. Defendants, such as Glock, use their success in the
6 police market to sell the same guns to the civilian market, including the illegal
7 secondary market, claiming them to be pistols of "perfection" and "hailed by police"
8 because of their "unfailing accuracy." The attributes that make the Glock pistol
9 attractive to an offensive law enforcement division, such as a SWAT team, -- the large
10 capacity of its magazine and its highly responsive trigger system, originally designed
11 for the Austrian Army without a manual safety or other mechanism that would in any
12 way minimize its trigger-readiness--are the same qualities that make it dangerous for
13 civilian use generally and especially for use by persons associated with criminal intent
14 and thus deemed prohibited possessors such as Furrow. A Glock firearm user will not
15 need to reload the weapon as often, and once a person has committed to shooting, rapid
16 fire is easy to maintain.

17     92.    Whatever the merits of the firearm for elite offensive police forces, Glock
18 designs its firearms without vital safety features allegedly for military and police and
19 then over markets them to civilians. Glock knows that its firearms are an experts' gun
20 that require the complete attention and control of its users. In particular, the pocket
21 rocket due to its small size requires even more care and skill to shoot.

22     93.    Glock's marketing practice is to sell to police departments' premature and
23 often unnecessary firearms upgrades so that it can obtain the used guns for resale on the
24 civilian market. Police trade-ins are big business for Glock, and it is estimated that
25 roughly 150,000 used Glock police guns have been resold in the last five years.
26 Numerous police departments across the country participate in Glock's trade-in
27 schemes. It is an historically known fact that gun manufacturers, such as Glock, have
28 sold unnecessary and expensive upgrades to law enforcement agencies with the

1  intention of exploiting after sales. Glock uses this tactic to circumvent existing legal

2  prohibitions. For example, Glock struck many beneficial deals with police departments

3  when Congress enacted the 1994 Assault Weapons Law. The Act banned the

4  manufacture of large capacity magazines—magazines holding more than ten cartridges.

5  Congress created one major exception to this law when it allowed manufacturers to

6  continue producing large capacity magazines for police departments. Glock recognized

7  and took advantage of the new demand for high-capacity firearms created by the 1994

8  ban, and in order to get its hands on "pre-ban" guns, Glock looked to the only entities

9  that could still supply them with the guns—the police.

10      94.    Other historic examples of Glock's exploitation of the law enforcement

11  market include the following documented events: The District of Columbia police

12  department traded its old Smith and Wesson .38 caliber revolvers for new Glock 9 mm

13  pistols in 1988. Although the Glock's were expensive --$1.3 million for 4,300 pistols or

14  $300 each, the department received a significant discount from Glock in the amount of

15  $284,000 for trading in its Smith & Wesson revolvers to Glock, each getting a $66

16  credit. For Glock, the used guns were worth more on the retail market, about $100 each.

17  Once Glock took possession of the revolvers, it sent them to a network of its roughly

18  dozen distributors across the country. The weapons then moved quickly to numerous

19  retail stores. Some were subsequently traced to crime.

20      95.    Although the average life span of a police officer's sidearm is ten years,

21  Glock encouraged the District of Columbia police department to upgrade from its 9 mm

22  semiautomatic pistol in less than six years. In 1994, the department traded in 4,646 of

23  its used 9 mm Glocks to obtain new .40 caliber Glocks at no cost to the department. In

24  addition, along with the guns, Glock threw in an added bonus of 16,000 high-capacity

25  magazines, each holding 15-17 bullets. In return, Glock obtained over 4,000 "pre-ban"

26  firearms, whose magazines alone had risen in value in anticipation of the 1994 Assault

27  Weapons Ban from $17.00 to $100.00. Similar deals have been made with police

28  departments in New Jersey, Virginia, Illinois, Michigan, Colorado, and Louisiana.

SECOND AMENDED COMPLAINT

96.    In 1988, Glock loaned more than a dozen 9-mm pistols to the New York Department of Environmental Conservation Law Enforcement Division (LED) to evaluate. In 1990, the LED decided to upgrade from its former standard-issue revolvers to Glock's 9-mm pistols. Although the guns were intended to last for twenty years, in 1993, Glock provided an upgrade to the 9-mm with the more powerful Glock .40 caliber pistols. Glock's overly aggressive marketing tactics were questioned by the New York Inspector General, who issued a scathing 1996 report that detailed "illegal and unethical conduct" by both Glock and senior LED officials.

97.    The Inspector General also stated that the Glock trade-in deal with New York's LED turned the police agency into a 'supermarket' for guns. The officers were allowed to directly buy back their traded in guns at steep discounts. A number of officers then illegally resold the guns, becoming in effect unlicensed dealers.

98.    In some cases, the old guns were simply given away to the police officers, or as in the New York LED and Washington, D.C. deals, sold directly to them at bargain rates. Tom Diaz explains this practice in his book Making a Killing: The Business of Guns In America as follows: Dealers and distributors who take police guns as trade-ins often pay minimal prices for them because the guns have been depreciated, or "costed out," on police accounting ledgers. Aiming to squeeze the most out of both ends of the police market, one gun writer urged retail dealers to aggressively market "tons of well-maintained" police revolvers being traded in for pistols and resold by distributors at "giveaway prices." Tom Diaz, Making a Killing: The Business of Guns In America (1999).

99.    Glock pistols which were formerly law enforcement guns are disproportionately traced to crime. Although the numbers are underreported, publicly available data from the ATF shows that since 1990, over 3,000 guns originating from police departments have ended up being used in crimes; 1/3 or 1,000 of those guns manufactured by Glock.

100.    More detailed data reveals that in 1993, at least 849 Glock 9 mm handguns

were recovered in the commission of a crime and traced by the ATF. In that same year, of those Glock guns, at least 135 were former police guns. For the year 1994, at least 1,478 Glock 9mm handguns were recovered in the commission of a crime and traced by the ATF. In that same year, of those Glock guns, at least 259 were former police guns. For the year, 1995, at least 1,310 Glock 9mm handguns were recovered in the commission of a crime and traced by the ATF. In that same year, of those Glock guns, at least 129 were former police guns.

101.   These numbers demonstrate Glock exploits the appeal of former police firearms to criminal users. Former ATF Agent Julius Wachtel, explains the allure of former police weapons: Criminals like to have the same kind of guns the cops have. [Trade-ins] are not only adding to the pool of guns available for misuse, but adding particularly lethal guns and making them more affordable.

102.   Glock's pocket rocket has two attributes most attractive to criminals, easy concealability and enhanced power. Despite their small size, Glock's "pocket rockets," which hold nine or ten rounds, have become what one prominent gun magazine described as the "Ultimate Conceal Package." Although ostensibly marketed to law enforcement, as shown below by the facts of this case, they are generally considered unsuitable as a police sidearm.

103.   All Defendants use the fear generated by the use of their firearms in crimes, and the crime market they facilitate, to promote their products as beneficial, even necessary, for self-protection, even though they are fully aware that the possession and use of firearms they encourage is dangerous to the individuals involved and to the public. Defendants' major markets for their products (excluding law enforcement, military and foreign markets), as explicitly identified by them or their trade associations and as is apparent in their promotions and advertisements, include concealed carrying in public places (including in cars and on the person on the streets and at workplaces), women and youth. For example, Defendants promote widespread purchase of handguns for concealed carrying in public places, although they are specifically aware of the

SECOND AMENDED COMPLAINT

1  danger presented by large numbers of untrained and unskilled people carrying
2  concealed handguns.

3      104.  After Defendants experienced stagnant or declining sales in the early
4  1990s to their traditional markets consisting overwhelmingly of men, they embarked on
5  a concerted effort to promote handguns to women and youth. In 1992, one of the
6  handgun industry's and defendants' leading trade associations, the National Shooting
7  Sports Foundation (NSSF), announced a "new focus on women and youngsters." NSSF
8  started a "Youth Education Program" in a search for new customers and expansion of
9  the gun market. The September/October 1992 issue of NSSF's magazine S.H.O.T.
10  Business carried a column by a noted celebrity in the industry, Grits Gresham, in which
11  he said: There's a way to help insure that new faces and pocketbooks will continue to
12  patronize your business: Use the schools.... [I]t's time to make your pitch for young
13  minds, as well as for the adult ones. Unless you and I. . . imprint our positions in the
14  minds of those future leaders, we're in trouble. (Emphasis added.)

15      105.  Some of defendants' ads specifically reflect these efforts. For example,
16  Defendant Glock specifically marketed its "pocket rocket" to women, promoting it as
17  fitting into a women's hand and purse.

18      106.  By using the fear enhanced by the crime market they facilitate, and by
19  failing to disclose known risks, defendants have misled consumers and deceptively
20  induced them to purchase firearms, substantially contributing to the large stock of
21  readily accessible firearms in the County of Los Angeles and the resulting injuries and
22  other distinct harm suffered by the plaintiffs.

23      107.  Defendants have full, actual knowledge of the crime market described
24  herein; of the easy ways to obtain a new, inexpensive, and highly lethal firearm for
25  criminal purposes; and of the disastrous consequences of their marketing and
26  distribution policies and practices on the plaintiffs and the public. Yet they fail to take
27  even minimal precautions completely within their power and discretion to prevent or
28  diminish the criminal market.

108.   Other manufacturers of dangerous or potentially harmful products have restricted their sales and their profits to minimize harm. For example, spray paint manufacturers, whose products have been used for graffiti that defaces property, adopted a "Responsible Retailing Program," which involved education and training of retailers and retracting opposition to, and cooperating with, bans on sales to minors. Similarly, manufacturers of all-terrain vehicles place stricter age limits on purchasers than the law requires based on statistics showing a high number of injuries among younger purchasers.

109.   Defendants do not take any supervisory or precautionary action based on the ATF crime-gun trace information provided to them on a daily basis, although it specifically shows which distribution channels are supplying the crime market.

110.   Defendants continue to sell their products through gun shows and FFLs who do not operate an actual store, although they know that these types of dealers in general, and many of them in particular, yield inordinate levels of firearms used in crime.

111.   Defendants also fail to take reasonable steps to minimize the known risks of possession of firearms. Defendants do not place any warnings on their products about the specific dangers and risks associated with possession of a firearm in the home and carrying a concealed firearm in public places. Although defendants are fully aware of these risks, they specifically contradict such warnings in their advertising and promotion, presenting firearms in the home and carried concealed on the streets as an unambiguous source of protection. While the public generally is aware that firearms are dangerous, most or many are not aware of these specific dangers and risks.

112.   The conduct by defendants alleged herein was negligent and reckless, and intentional in the sense that one intends the known or likely consequences of one's actions.

113.   Defendants knew or should have known that their conduct, as alleged herein, created or contributed to a danger to other persons and to the public generally,

including specifically a danger to people like plaintiffs, who would likely be injured as a result thereof although they are entirely innocent of any wrongdoing. Specifically, defendants knew or should have known that their marketing, promotion, distribution, importation, and sale of firearms in the manner set out herein -- by which each of the specific firearms used in these incidents set forth hereinabove and hereinafter came to be in the possession of a person like Furrow had in the past resulted and would likely continue to result in injuries of the type and in the circumstances of the injuries suffered by these plaintiffs.

## COUNT I

## SURVIVAL ACTION

### (By Plaintiff Lilian Santos Ileto Against All Defendants)

114.   The averments of paragraphs 1 through 113 hereof are incorporated by reference as though fully set forth here.

115.   Joseph Ileto died on or about August 10, 1999, in Los Angeles County, California.

116.   No proceedings are now pending in California or elsewhere for the administration of Joseph Ileto's estate.

117.   Plaintiff Lilian Ileto is the mother of Joseph Ileto, is his sole heir, is his successor in interest (as defined in Section 377.11 of the California Code of Civil Procedure), and succeeds to Joseph Ileto's interest in this action.

118.   No other person has a superior right to commence this action.

119.   The declaration required under California Code of Civil Procedure § 377.32 was attached to the initial complaint, with a certified copy of Joseph Ileto's death certificate annexed. True and correct copies of these documents are attached to this amended complaint and incorporated in it by this reference.

120.   The knowing, intentional, reckless, and negligent conduct of defendants, as set forth above, breached their legal duty to Joseph Ileto, constituted a public nuisance, and were attended by circumstances of oppression, fraud and malice within

SECOND AMENDED COMPLAINT

the meaning of California Civil Code § 3294.

121.   The defendants' breach of legal duty to Joseph Ileto through their knowing, intentional, reckless, and negligent conduct, as set forth above, foreseeably and proximately caused injury and death to Joseph Ileto.

122.   The numerous compensable injuries thus caused to Joseph Ileto and sustained prior to his death include but are not limited to assault and battery via the use of weapons sold or marketed by defendants.

123.   Pursuant to California Code of Civil Procedure § 377.34 and other provisions of law, Plaintiff Lilian Ileto seeks damages for all loss or damage that Joseph Ileto sustained or incurred before death as a result of defendants' conduct, including the penalties and punitive and exemplary damages that Joseph Ileto would have been entitled to recover had he lived, together with attorneys' fees and other applicable law, interest, and costs.

COUNT II

WRONGFUL DEATH

(By Plaintiff Lilian Santos Ileto Against All Defendants)

124.   The averments of paragraphs 1 through 123 hereof are incorporated by reference as though fully set forth here.

125.   Lilian Santos Ileto is Joseph Ileto's sole heir and would be entitled to Joseph Ileto's property by intestate succession.

126.   The knowing, intentional, reckless, and negligent conduct of defendants, as set forth above, breached their legal duty to Lilian Santos Ileto, constituted a public nuisance, and was attended by circumstances of oppression, fraud and malice within the meaning of California Civil Code § 3294. The numerous injuries to Lilian Santos Ileto foreseeably and proximately caused by defendants' conduct, as set forth above, include but are not limited to loss of Joseph Ileto's love, companionship, comfort, affection, society, solace, support, and physical assistance in the operation or maintenance of the home.

SECOND AMENDED COMPLAINT

127.    Plaintiff Lilian Ileto seeks an award of all damages that may be just under all the circumstances of the case, and all applicable penalties and punitive and exemplary damages, together with attorneys' fees and other applicable law, interest, and costs.

COUNT III

PUBLIC NUISANCE

(By All Plaintiffs Against All Defendants)

128.    The averments of paragraphs 1 through 127 hereof are incorporated by reference as though fully set forth here.

129.    Through their conduct their policies and practices for marketing and distribution of firearms, as set forth above defendants have knowingly created and maintained an unreasonable interference with rights common to the general public, constituting a public nuisance under California law.

130.    Overall, defendants market, distribute, promote and sell firearms, a lethal product, with reckless disregard for human life and for the peace, tranquility, and economic well being of the public. They have knowingly created, facilitated and maintained an over-saturated firearms market that makes firearms easily available to anyone intent on crime. The particular firearms used in these incidents were marketed, distributed, imported, promoted and sold by defendants in the manner set out herein, which defendants knew or should have known facilitates and encourages easy access by persons intent on murder, mayhem or other crimes, including legally prohibited purchasers such as Furrow. Their conduct has thereby created and contributed to a public nuisance by unreasonably interfering with public safety and health and undermining California's gun laws, and it has resulted in the specific and particularized injuries suffered by plaintiffs.

131.    Defendants' unrestrained conduct maximizes sales of their lethal products, without any check or precaution, by knowingly establishing, supplying and maintaining an over-saturated firearms market that facilitates easy access for criminal purposes,

SECOND AMENDED COMPLAINT

including access by persons prohibited to purchase or possess firearms under state or federal law. Defendants have full knowledge that their policies and practices will and regularly do result in substantially increased levels of firearms use in crime throughout the Nation and in California, and that their conduct has a continuing, substantial detrimental effect on the public.

132.   Defendants thereby substantially interfere with public rights common to the general public. The resulting inordinately high levels of firearms use in crime affect the rights of the considerable number of members of the public. The general public is rendered vulnerable to crime and assault, and defendants' conduct obstructs the free passage or use, in the customary manner, of the public parks, squares, streets, and highways within the meaning of California Penal Code § 370.

133.   Defendants' interference with rights common to the public is unreasonable in at least three respects:

134.   It significantly interferes with the public safety, health or peace. This interference is not insubstantial or fleeting, but rather involves a disruption of public peace and order in that it adversely affects the fabric and viability of the entire community, and a substantial number of persons, within the meaning of California Civil Code § 3480.

135.   It is continuing conduct, and it has produced a permanent or long-lasting effect, and defendants know or have reason to know that it has a significant effect upon the public right. Defendants continually engage in their reckless conduct even as they are continually informed of the resulting substantial, permanent and long-lasting harm and even as they receive daily notice from the ATF of the distribution channels they use that are doing the most harm. Defendants have reason to know - and actually know of the disastrous, continuing and long-lasting effects of their conduct on the public.

136.   Though not necessarily proscribed per se by law, defendants' conduct nevertheless undermines state and federal law restricting gun sales and possession and renders enforcement of such laws difficult or impossible. In this sense, defendants'

SECOND AMENDED COMPLAINT

interference with a common public right is contrary to public policy as established by state and federal law, and the interference is therefore unreasonable. A firearm used in connection with a crime is deemed to constitute a public nuisance under California Penal Code § 12028(b).

137.    Specifically, California is acknowledged to have some of the most stringent firearm laws in the country, yet guns are widely obtained out of state and possessed and used by unauthorized users such as Furrow to cause harm in California. By failing to market and distribute their firearms generally in a manner consistent with the policies manifested in California's laws, Defendants deliberately circumvent these policies.

138.    The community and the parents of the children and the family of Joseph Ileto have a reasonable expectation that the strict firearms laws of California will serve to protect them. Defendants' conduct in oversupplying the market in more lax jurisdictions facilitates firearms getting into the hands of prohibited persons, such as Furrow, who then bring them to the State of California, and cause an interference with the rights common to the public and specifically cause injury and death to the plaintiffs.

139.    The parents of the children and the family of Joseph Ileto can take no comfort in the laws of the State of California as long as defendants' irresponsible conduct in oversupplying and marketing their products elsewhere creates an undue risk that persons determined by law to be incompetent to responsibly possess them will in fact readily possess them and inflict injuries and deaths in California.

140.    Defendants' interference with rights common to the public is also unreasonable based on the totality of the circumstances.

141.    Defendants' conduct, as set forth above, is negligent, reckless, outrageous, with a reckless and wanton disregard and indifference to the rights and safety of others, and intentional in the sense that one intends the likely, usual or known consequences of one's acts, and has been attended by circumstances of oppression, fraud and malice within the meaning of California Civil Code § 3294.

142.    Defendants fail to take even minimal steps completely within their power and discretion that would eliminate, ameliorate or substantially minimize the harm.

143.    Plaintiffs have suffered and are suffering harms different from that suffered by the general public, as set forth above. Such harms are specially injurious to plaintiffs within the meaning of California Civil Code § 3493, and it would be unreasonable and unfair to plaintiffs for defendants to engage in the conduct set out herein without paying for the harm done.

144.    Plaintiffs have sustained injury proximately and foreseeably caused by the public nuisance created and maintained by defendants, including but not limited to personal injury, death, pain and suffering, severe emotional distress, lost companionship, medical expenses, and lost income.

145.    Plaintiffs seek an award of all damages sustained as the result of defendants' tortious conduct, including an award of applicable penalties and punitive or exemplary damages, abatement, together with attorneys' fees and other applicable law, interest, and costs.

## COUNT IV

### NEGLIGENCE

#### (By All Plaintiffs Against All Defendants)

146.    The averments of paragraphs 1 through 145 hereof are incorporated by reference as though fully set forth here.

147.    The knowing, intentional, reckless, and negligent conduct of defendants, as set forth above and herein, was unreasonable and breached defendants' legal duty to plaintiffs, and was attended by circumstances of oppression, fraud and malice within the meaning of California Civil Code § 3294.

148.    Defendants' deliberate and reckless marketing strategies caused their firearms to be distributed and obtained by Furrow resulting in injury and death to the plaintiffs.

149.    Defendants produce more firearms than meet the legitimate market

1    demand with the intent of marketing their firearms so that they get into the hands of
2    those in the secondary market.

3    150.    Specifically, Glock targets its firearms to law enforcement first to gain
4    credibility and then uses the cachet or prestige that goes along with selling guns to law
5    enforcement to infiltrate the civilian market. Although Glocks are not inappropriate or
6    unsafe for their intended purpose--use by well-trained elite offensive police forces--,
7    they are not appropriate for civilians or unskilled users. Glock also exploits its status
8    and position with law enforcement to sell guns originally tailored to police to criminals,
9    knowing that the characteristics former police guns have—high caliber, capacity and
10   concealability-- will appeal to prohibited users, such as Furrow.

11   151.    Glock's pursuit of selling to law enforcement is part of an intentional
12   strategy to bolster sales at any cost. Glock has aggressively pursued law enforcement
13   officers to help sell its guns and win favor in the civilian and criminal market.

14   152.    For years, Glock has operated the police market with national sales and
15   services managers, all of whom are former law-enforcement officials. Glock will do
16   anything to win favor among police forces by offering incentives, deals, upgrades, and
17   encouraging police departments to try out new models. Glock and its distributors are
18   ready to make deals when police trade-ins are ready and often encourage earlier trade-
19   ins than planned. Glock's dealers are then able to sell new and more expensive firearms
20   to police and former police guns to civilians and therefore cash-in on both sides of the
21   trade-in deal.

22   153.    Specifically, the Glock pistol used by Furrow to shoot and kill Joseph
23   Santos Ileto, was a former police gun and involved a sweetheart deal. Glock and its
24   distributor, RSR Seattle, intended to gain the most out of both sides of the police
25   market when it made its deals with the Cosmopolis police department. The gun used by
26   Furrow was initially shipped to the police department on January 15, 1996, along with
27   another gun of the same model. After trying the gun out, however, the Cosmopolis
28   police department was not satisfied with the guns because it thought they were too

small to fit into a larger person's hand. One week later, the Cosmopolis police department decided to exchange the guns, unused, for another Glock model, so it contacted a former Cosmopolis reserve officer, Don Dineen ["Dineen"], who maintained a gun store in Cosmopolis to perform the trade. Dineen, in turn, contacted a Glock distributor, RSR Seattle, that he had dealt with before in the past, requesting the two new Glock guns of a different model for trade to the Cosmopolis police department. RSR Seattle shipped the new models to Dineen agreeing that payment did not have to be made until the former police guns were sold.

154.    Dineen exchanged the new Glock models to the police department for the model 26's at no cost to the department. Dineen was then able to sell one of the "used" former police guns at a significantly reduced price to a "collector" without having to lay out a dime or take any credit risk.

155.    Dineen sold the former police gun to "gun collector," David Wright at a significant discount. Don knew David Wright well because he frequented his gun shop and often "hung out" there. Don had introduced David Wright to another "gun collector", Andrew Palmer, at the gun shop, and along with Dineen, they often discussed many things at the gun shop while drinking coffee around a table, that they referred to as the "table of knowledge." Dineen knew that neither David Wright nor Andrew Palmer had a federal firearms license, meaning they did not have to run a background check on the purchasers of their guns, and he knew that both frequently sold and traded guns at gun shows in Spokane, Washington, a city near Hayden Lake, Idaho, the town that serves as the home enclave for the Aryan Nations and the neo-nazi group, to which Furrow was a member. In fact, David Wright sold the Glock model 26 to Andrew Palmer, along with three other "collectibles" for sale at a gun show in Spokane, Washington. It is at this gun show in Spokane, Washington, that Furrow is believed to have purchased the Glock in 1998, from unlicensed dealer Andrew Palmer.

156.    Glock gained the most out of both sides of the police market by this sale to the police department and to David Wright. Glock initially sold the gun to a police

SECOND AMENDED COMPLAINT

department, however, when the police department was dissatisfied with the gun, it sold an upgraded, more expensive gun to the police department at no cost and then pushed the one-week old, unused, trade-in gun as a depreciated or "costed out" gun, enabling its distributor, RSR Seattle, to offer a sweetheart deal to former reserve officer and gun store owner, Dineen.

157.    Because of the high number of criminal gun traces to RSR, both Glock and RSR should have been aware of the increased dangers of a former police gun, pocket rocket sold below cost would increase the probability of the gun ending up in the secondary market.

158.    Ultimately, this police trade-in deal had dire consequences for the plaintiffs by putting the gun into the hands of convicted felon and neo-nazi, Furrow, who then injured and killed them. The source of the gun used by Furrow came from a police department, a market that Glock has manipulated and worked with for years. It was foreseeable that Glock and RSR were arming unlicensed persons by selling its former police guns in these channels in Washington State and Glock and RSR had a duty to avoid creating such unreasonable risks of injury above and beyond the risks that would exist if they conducted their businesses in ways to decrease rather than increase the likelihood of criminal misuse. Glock failed to exercise reasonable care in selling its handguns to the Cosmopolis police department, and the department failed to exercise reasonable care in its disposition of the handguns.

159.    The defendants' breach of legal duty to plaintiffs through their knowing, intentional, reckless, and negligent conduct, as set forth above, foreseeably and proximately caused injury, emotional distress, and death to plaintiffs.

160.    The possible identities of other dealers, resellers and "collectors" who provided firearms to Furrow have been revealed in press reports, but at this time plaintiffs do not have sufficient knowledge, information or evidence to add them as defendants. They or others may be specifically added later as among the DOE defendants.

161.   Upon information and belief, the particular firearms used by Furrow in these incidents set forth hereinabove were marketed, distributed, imported, promoted, or sold by each of the defendants in the high-risk, crime-facilitating manner and circumstances described herein, including gun shows, "kitchen table" dealers, pawn shops, multiple sales, straw purchases, faux "collectors," and distributors, dealers and purchasers whose ATF crime-trace records or other information defendants knew or should have known identify them as high-risk. Defendants' practices knowingly facilitate easy access to their deadly products by people like Furrow.

162.   The numerous compensable injuries suffered by plaintiffs include but are not limited to personal injury, death, pain and suffering, severe emotional distress, lost companionship, medical expenses, and lost income.

163.   Plaintiffs seek an award of all damages sustained as the result of defendants' tortious conduct, including an award of applicable penalties and punitive or exemplary damages, together with attorneys' fees and other applicable law, interest, and cost.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs request the following relief:

1.     entry of judgment against all defendants;

2.     an award of compensatory damages and general and special damages in favor of plaintiffs, including the class, and against defendants, jointly and/or severally, in an amount to be determined at trial;

3.     an award of exemplary or punitive damages pursuant to California Civil Code § 3294 or other applicable provisions of law;

4.     an award of plaintiffs' prejudgment interest and costs of suit as permitted by law; and

5.     such other and further relief as may be just and proper under the circumstances.

SECOND AMENDED COMPLAINT

1    DATED: March 8, 2012

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KIESEL BOUCHER LARSON LLP

By: _____
    Raymond P. Boucher
    Steven D. Archer
    Jeffrey A. Koncius

**BERGER & MONTAGUE, P.C.**
    Merrill Davidoff (*Admitted Pro Hac Vice*)
    Neil Mara (*Admitted Pro Hac Vice*)
    *Attorneys for Plaintiffs*

**THE EDUCATION FUND TO STOP GUN VIOLENCE**
    Sayre Weaver (CA Bar No. 116957)
    Joshua M. Horwitz
    (*Admitted Pro Hac Vice*)

    *Attorneys for Plaintiffs*

SECOND AMENDED COMPLAINT

## DECLARATION OF LILIAN S. ILETO
## PURSUANT TO CAL. CODE CIV. PROC. § 377.32

I, Lilian S. Ileto, hereby declare as follows:

1.    The name of decedent in this action is Joseph Ileto.

2.    Joseph Ileto died in Los Angeles County, California, on August 10, 1999.

3.    No proceeding is now pending in California for administration of the

decedent's estate.

4.    Decedent's estate was not administered.

5.    I am Joseph Ileto's mother and his sole heir, by intestacy.  I am decedent's

successor in interest (as defined in section 377.11 of the California Code of Civil

Procedure) and succeed to the decedent's interest in this proceeding.

6.    No other person has a superior right to commence this action or to be

substituted for the decedent in the proceeding.

I affirm and declare under penalty of perjury under the laws of the State of

California that the foregoing is true and correct.


Dated: August 8, 2000                    _Lilian S. Ileto_
                                          LILIAN S. ILETO


5078.1-00117719.WPD-

# COUNTY OF LOS ANGELES

## DEPARTMENT OF HEALTH SERVICES

### CERTIFICATE OF DEATH

STATE OF CALIFORNIA
USE BLACK INK ONLY—NO ERASURES, WHITEOUTS OR ALTERATIONS
VS-11 (REV 1/97)

**STATE FILE NUMBER** | **LOCAL REGISTRATION NUMBER**

**DECEDENT PERSONAL DATA**

1. NAME OF DECEDENT—FIRST (GIVEN): Joseph
2. MIDDLE: Santos
3. LAST (FAMILY): Ileto
4. DATE OF BIRTH MM/DD/CCYY: 03/19/1960
5. AGE YRS.: 39
6. SEX: Male
7. DATE OF DEATH MM/DD/CCYY: 08/10/1999
8. HOUR: 1204
9. STATE OF BIRTH: PI
10. SOCIAL SECURITY NO.: 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
11. MILITARY SERVICE: NO
12. MARITAL STATUS: Never Married
13. EDUCATION—YEARS COMPLETED: 14
14. RACE: Filipino
15. HISPANIC—SPECIFY: NO
16. USUAL EMPLOYER: Government
17. OCCUPATION: Mail Carrier
18. KIND OF BUSINESS: U S Postal Service
19. YEARS IN OCCUPATION: 2

**USUAL RESIDENCE**

20. RESIDENCE—STREET AND NUMBER OR LOCATION: 2142 Rancho Hills Drive
21. CITY: Chino Hills
22. COUNTY: San Bernardino
23. ZIP CODE: 91709
24. YRS IN COUNTY: 9
25. STATE OR FOREIGN COUNTRY: CA

**INFORMANT**

26. NAME, RELATIONSHIP: Lilian S. Ileto, Mother
27. MAILING ADDRESS (STREET AND NUMBER OR RURAL ROUTE NUMBER, CITY OR TOWN, STATE, ZIP): 641 W. Gleeson St., Monterey Park, CA 91754

**SPOUSE AND PARENT INFORMATION**

28. NAME OF SURVIVING SPOUSE—FIRST:
29. MIDDLE:
30. LAST (MAIDEN NAME):
31. NAME OF FATHER—FIRST: Delmacio
32. MIDDLE: G
33. LAST: Ileto
34. BIRTH STATE: PI
35. NAME OF MOTHER—FIRST: Lilian
36. MIDDLE: K
37. LAST (MAIDEN): De los Santos
38. BIRTH STATE: PI

**DISPOSITION(S)**

39. DATE MM/DD/CCYY: 08/14/1999
40. PLACE OF FINAL DISPOSITION: Rose Hills Memorial Park, 3888 S. Workman Mill Rd.,Whittier,CA 90601

**FUNERAL DIRECTOR AND LOCAL REGISTRAR**

41. TYPE OF DISPOSITION(S): BU
42. SIGNATURE OF EMBALMER:
43. LICENSE NO.: 8523
44. NAME OF FUNERAL DIRECTOR: Rose Hills Mortuary
45. LICENSE NO.: FD-970
46. SIGNATURE OF LOCAL REGISTRAR:
47. DATE MM/DD/CCYY: 08/13/1999

**PLACE OF DEATH**

101. PLACE OF DEATH: DRIVEWAY
102. IF HOSPITAL, SPECIFY ONE:
103. IF OTHER THAN HOSPITAL, SPECIFY:
104. COUNTY: LOS ANGELES
105. STREET ADDRESS—STREET AND NUMBER OR LOCATION: 9944 VALLEY CIRCLE
106. CITY: CHATSWORTH

**CAUSE OF DEATH**

107. DEATH WAS CAUSED BY: (ENTER ONLY ONE CAUSE PER LINE FOR A, B, C, AND D)

IMMEDIATE CAUSE (A) MULTIPLE GUNSHOT WOUNDS

TIME INTERVAL BETWEEN ONSET AND DEATH: RAPID

108. DEATH REPORTED TO CORONER: YES — FERRAL NUMBER: 99-05475

DUE TO (B)

DUE TO (C)

109. BIOPSY PERFORMED: NO

110. AUTOPSY PERFORMED: YES

DUE TO (D)

111. USED IN DETERMINING CAUSE: YES

112. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO CAUSE GIVEN IN 107: NONE

113. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? IF YES, LIST TYPE OF OPERATION AND DATE: NO

**PHYSICIAN'S CERTIFICATION**

114. I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED.
115. SIGNATURE AND TITLE OF CERTIFIER:
116. LICENSE NO.:
117. DATE MM/DD/CCYY:
117B. TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP:

**CORONER'S USE ONLY**

I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED.
118. INJURY AT WORK: NO
121. INJURY DATE M/D/CCYY: 08/10/1999
122. HOUR: 1153
123. PLACE OF INJURY: DRIVEWAY
119. MANNER OF DEATH: HOMICIDE
124. DESCRIBE HOW INJURY OCCURRED (EVENTS WHICH RESULTED IN INJURY): SHOT TO HEAD, CHEST, ARM AND LEG BY ASSAILANT
125. LOCATION (STREET AND NUMBER OR LOCATION AND CITY, ZIP): 9944 VALLEY CIRCLE, CHATSWORTH 91311

126. SIGNATURE OF CORONER OR DEPUTY CORONER:
127. DATE MM/DD/CCYY: 08/12/1999
128. TYPED NAME, TITLE OF CORONER OR DEPUTY CORONER: JUANA GARCIA/DEPUTY CORONER

9659

**STATE REGISTRAR** | A | B | C | D | E | F | G | FAX AUTH. #: 918-5973 | CENSUS TRACT

090261319

This is a true certified copy of the record filed in the County of Los Angeles Department of Health Services if it bears the Registrar's signature in purple ink.

DATE ISSUED

Director of Health Service and Registrar

This copy not valid unless prepared on engraved border displaying seal and signature of Registrar.

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

